

FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2005 JUN -8  A II: 42

SIGN_____
BY DEPUTY CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TRUSTEE OF FLEETCOR TECHNOLOGIES LICENSEE TRUST #1, ET AL. | CIVIL ACTION |
| VERSUS | JUDGE BRADY |
| FLEET FUEL, INC., ET AL. | |
| VERSUS | MAGISTRATE: RIEDLINGER |
| RONALD F. CLARKE and JOHN G. BERYLSON | NO. 05-235-D-M1 |

**BARNEY HOLLAND OIL COMPANY'S**
**THIRD PARTY COMPLAINT**

**NOW INTO COURT**, through the undersigned counsel, comes the Barney Holland Oil Company ("BHOC") now in its capacity as Third Party Plaintiff, complaining of Ronald F. Clarke and John G. Berylson and, as grounds therefore, would respectfully show the Court as follows:

1. Third Party Plaintiff, BHOC, is a Texas corporation with its principal place of business in Texas.

2. Third Party Defendant, Ronald F. Clarke ("Clarke"), is currently the Chairman and Chief Executive Officer of FleetCor Technologies, Inc. and a resident of the State of Georgia.

6/8/05 issued Summons

3. Third Party Defendant, John G. Berylson ("Berylson"), was formerly the Chairman of the Board and is now a member of the Board of Directors of FleetCor Technologies, Inc. and a resident of the State of Massachusetts.

**FACTUAL ALLEGATIONS**

4. This is a securities actions brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C. §78j(b) and 78t(a), and the regulations promulgated thereunder by the Securities and Exchange Commission, including Rule 10b-5, 17 C.F.R. §240.10b-5.

5. Jurisdiction is proper in this Court pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1331.

6. Venue is proper in this District because this Third Party Complaint is directly related to, and arises out of, the same facts as that original Complaint and the original Counterclaim pending in this cause. Third Party Defendants selected this venue when they elected to file the original Complaint here. Furthermore, many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

7. At all relevant times, Fleetman, Inc. (in or about April 2002, Fleetman, Inc. changed its name to FleetCor Technologies, Inc. ("FleetCor")) has operated a fuel program wherein businesses with a fleet of automobiles, trucks, and other vehicles could acquire fuel at participating stations around the country. From the early 1990s through 2002, FleetCor operated the fuel program, generally known as the "Fuelman" program, through a series of license agreements in which third parties acquired exclusive rights to operate the program within defined geographical territories.

8.     On or about October 3, 1995, BHOC entered in a Fuelman License Agreement with Fleetman, Inc. (the "License Agreement") wherein BHOC acquired the exclusive right to market the Fuelman program in the Dallas-Fort Worth market. The License Agreement remains in full force and effect.

9.     In early 2001, the Fuelman program was suffering from serious computer software programming problems as well as from serious financial problems. Clarke, who was then serving as FleetCor's Chief Executive Officer, and John Berylson, who was then serving as the Chairman of the Board of Directors of FleetCor, met with BHOC and approximately 29 other licensees from around the country and asked them to invest a combined $750,000 to be used to redesign Fuelman's software and to make other needed improvements to the computer program. Each licensee was asked to invest $25,000.

10.    In return for the $25,000 investment, each participating licensee was promised a more efficient computer program and a future ownership interest in FleetCor by the creation of a licensee warrant program by which participating licensees who invested $25,000 and who remained in good standing through December 26, 2004 would be entitled to acquire FleetCor common stock (the "Licensee Warrant Program").

11.    BHOC, along with each of the other 29 licensees, agreed to make the investment totaling $750,000. BHOC paid one-half of the $25,000 in June 2001.

12.    Per the September 13, 2001 correspondence from Clarke entitled "Licensee Warrant Program" (the "September 2001 Correspondence"), Clarke advised BHOC and the other licensees that FleetCor had "...finalized the [Licensee Warrant] [P]rogram..." and that the Licensee Warrant Program was for qualified participants with the warrants to be allocated

"...pro-rata to individual participants based on their total gallons processed between 07/02/01 to 12/26/04." See "Exhibit A."

13. The September 2001 Correspondence specifically stated:

> In our ongoing efforts to build stronger ties with the licensee group and encourage network growth, FleetCor recently announced it would be introducing a licensee warrant program. **We are pleased to advise you that we have finalized the program design** and would like to share the program details with you at this time.

*See* Exhibit "A" (Emphasis added).

14. The September 2001 Correspondence further explained the eligibility requirements of the Licensee Warrant Program:

> All active Fuelman licensees currently in "good standing" will be eligible participants in the program. Good standing means that participants are in compliance with current contractual fee arrangements. Participants must remain actively processing and in good standing through the 2004 processing year to maintain their eligibility in the program. In the event a participant's territory is sold or transferred during the term of the program, the rights to the warrant grant will be assigned to the buyer of the territory. Other than the assignment of rights to the buyers of these territories, no additional participants will be added to the program.

15. Clarke further represented in the September 2001 Correspondence that "[i]n the event a participant terminates [its] relationship with FleetCor and 'takes' [its] gallon production away from the network, [its] gallon production will not be included in determining the final warrant allocations." *See* Exhibit "A."

16. Thereafter, BHOC paid the balance of its promised $25,000 investment.

17. The License Agreement, and based on information and belief, all other Fuelman license agreements, contain a provision allowing FleetCor to terminate each such license agreement by paying the licensee an amount of money determined by a formula set forth in each

4

license agreement. Sometime after January 2002, FleetCor began a process of terminating almost all the license agreements that it had in place with various licensees around the country. FleetCor then began direct operation of the Fuelman program in the territories formerly covered by the terminated licenses.

18. BHOC's License Agreement remained in full force and effect through the 2004 processing year and BHOC remains a licensee in good standing. Based on information and belief, only about four other territories remain licensed to third parties. FleetCor has terminated all the other licenses and now operates in those markets either directly or through controlled entities, none of which entities met the specific qualification of being a licensee in good standing on December 26, 2004 because FleetCor previously had terminated their licenses. They therefore are ineligible, per the September 2001 Correspondence, to participate in the Licensee Warrant Program.

19. In 2003, after having terminated many of its license agreements, FleetCor, acting unilaterally and without the knowledge or consent of BHOC, created FleetCor Technologies Stock Trust # 1 (the "2003 Trust") and, according to FleetCor's own admissions, transferred the 415,000 Warrants into the 2003 Trust. That transfer was to be to a "...mutually agreed-upon escrow agent..." per the September 2001 Correspondence. FleetCor did not obtain BHOC's consent as to the party that FleetCor selected to be the escrow agent and, by unilaterally selecting the escrow agent without the consent of all the participants in the Licensee Warrant Program, FleetCor breached the terms of the Licensee Warrant Program. Some time after the creation of the 2003 Trust, FleetCor advised some licensees, but still not BHOC, that the Warrants had been

transferred into the Trust, but that the only substantive change was to lower the "strike" price from $5.00 to $3.50.

20. In truth and in fact, however, the unilateral change that FleetCor attempted to effectuate was to remove ownership of most of the Warrants from the qualifying licensees who owned the Warrants. The Licensees who made a part of the original $750,000 investment and who remained active and in good standing on December 26, 2004 were and are the vested owners of the Warrants. FleetCor's attempt to add new entities who did not make the investment and are not the Licensees is an attempt to convert ownership of the Warrants from the remaining Licensees to an ineligible party, i.e., FleetCor, the licensor.

21. Pursuant to the terms of the Licensee Warrant Program, as defined in the September 2001 Correspondence and on which BHOC relied when the licensees each individually agreed to invest what collectively amounted to $750,000, the 415,000 Warrants would be owned, on December 26, 2004, by those then existing licensees who had remained in good standing. Ownership interest among such licensees was to be in a ratio equal to gallons of fuel sold by each licensee within a defined time period. FleetCor, as the licensor, and as the recipient of the $750,000 investment, had no ownership interest in the Warrants, fixed or contingent, and, as the licensor, was ineligible to participate in the Licensee Warrant Program, per the express representations listed in the September 2001 Correspondence. At the time of the September 2001 Correspondence, FleetCor operated the New Orleans market directly, i.e., not through a license arrangement. The September 2001 Correspondence, which set forth all the eligible licensee participants, specifically did not include the New Orleans territory or any subsidiary or controlled entity of FleetCor, or FleetCor itself. By FleetCor's own admission, it

6

was not a participant in the Licensee Warrant Program even for the gallons associated with its New Orleans territory. The primary unilateral "change" that FleetCor attempted to subsequently make by the creation of the 2003 Trust was to add the New Orleans territory and all other previously-licensed and now directly operated markets as eligible participants in the Licensee Warrant Program.

22. FleetCor had no contractual or other legal right to unilaterally change the terms of the Licensee Warrant Program, and certainly had no contractual or other legal right to unilaterally divest ownership of the majority of the Warrants from the approximately four qualifying, remaining licensees to itself or its controlled entities.

## CAUSES OF ACTION

### VIOLATION OF FEDERAL SECURTIES LAWS

23. BHOC adopts, realleges, and incorporates the preceding allegations of its third party complaint as if copied herein *in extenso*.

24. This count is based on Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder.

25. Warrant number 42 for 415,000 shares of FleetCor common stock, as described in the "Common Stock Purchase Warrant," constitutes a security, pursuant to Section 3(a)(10) of the Exchange Act.

26. In 2001, FleetCor offered to sell and engaged in the sale of securities in the form of a Licensee Warrant Program.

27. At all relevant times, Clarke, as Chief Executive Officer, and Berylson, as Chairman of the Board of Directors, were, and acted as, controlling persons of FleetCor within

the meaning of Section 20(a) of the Exchange Act as alleged herein. Clarke and Berylson made the specific written and oral representations that are the basis of this suit. Furthermore, by virtue of their high-level positions with FleetCor, their participation in and/or awareness of FleetCor's operations, and/or intimate knowledge of FleetCor's actual performance, Clarke and Berylson had knowledge of, and in fact, participated in the efforts to misrepresent the terms and conditions of the Licensee Warrant Program so that it could secure BHOC's investment in FleetCor.

28. In 2001, Clarke and Berylson, acting as controlling persons of FleetCor, misrepresented the terms of the Licensee Warrant Program and failed to make certain material disclosures pertaining to the terms of the Licensee Warrant Program in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

29. More particularly, in 2001, Clarke represented that the Licensee Warrant Program had been finalized as of September 13, 2001 and that "...no additional parties will be added to the [Licensee Warrant] [P]rogram." In reliance on such representations, BHOC participated in the Licensee Warrant Program and paid its $25,000 to FleetCor.

30. Clarke represented that the eligible participants under the Licensee Warrant Program were "...all active Fuelman licensees currently in good standing..." and that "...no additional participants will be added to the [Licensee Warrant] [P]rogram." Contrary to that specific representation, FleetCor now seeks to add itself and other controlled entities as additional participants to the Licensee Warrant Program, all to the detriment of BHOC.

31. Clarke and Berylson failed to disclose and/or provide notice to BHOC of material modifications that FleetCor subsequently attempted to make to the Licensee Warrant Program.

32.     In 2003, Clarke subsequently represented to the licensees that participated in the Licensee Warrant Program that the major provisions of the Licensee Warrant Program remained "...substantially the same as outlined in our September 2001 memo, with the exception of the warrant price, which has been reduced..." Contrary to that representation, FleetCor now seeks to incorporate and enforce significant substantive changes that adversely affect BHOC's vested interests.

33.     It is now apparent that FleetCor unilaterally tried to amend the Licensee Warrant Program, without notice to BHOC, all to FleetCor's benefit and to the detriment of BHOC.

34.     Clarke and Berylson directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon BHOC, made various deceptive and untrue statements of material facts, and failed to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to BHOC.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce BHOC to purchase the securities under the Licensee Warrant Program.

35.     Clarke and Berylson, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly (i) issued, (ii) caused to be issued, and (iii) participated in the issuance of the preparation and issuance of deceptive and materially false and misleading statements to BHOC, all as particularized above.

36.     BHOC relied on such representations to its detriment.  The misrepresentations were each the proximate cause of substantial damages that will be suffered by BHOC as a result

of the wrongs herein alleged in an amount to be proved at trial if Clarke, Berylson, and FleetCor are able to prevail in their unilateral attempt to divest the remaining licensees/participants in the Licensee Warrant Program of over 80% of the Warrants.

37. By reason of the foregoing, Clarke, Berylson, and FleetCor directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that each of them: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or failed to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon BHOC in connection with its purchase of securities under the Licensee Warrant Program.

38. By reason of the foregoing, Clarke and Berylson are also liable for damages caused by the acts set forth above pursuant to both Section 10(b) and Section 20(a) of the Exchange Act.

**VIOLATION OF LOUISIANA SECURTIES LAWS**

39. BHOC adopts, realleges, and incorporates the preceding allegations of its third party complaint as if copied herein *in extenso*.

40. Warrant number 42 for 415,000 shares of FleetCor common stock, as described in the "Common Stock Purchase Warrant," constitutes a security pursuant to Louisiana Securities Law, La. R.S. 51:702 (15)(a).

41. Clarke, Berylson, and FleetCor misrepresented the terms of the Licensee Warrant Program and failed to make certain material disclosures pertaining to the terms of the Licensee Warrant Program in violation of Louisiana Securities Law, La. R.S. 51:701, *et seq.*

42. Having relied on Clarke's, Berylson's, and FleetCor's misrepresentations and failure to disclose material information to BHOC, BHOC will suffer, and has suffered, significant damages if FleetCor is permitted to proceed with its unilateral attempt to amend the Licensee Warrant Program in 2003, approximately two years after the terms of the Licensee Warrant Program had been finalized on September 13, 2001.

**VIOLATION OF TEXAS SECURITIES LAWS**

43. BHOC adopts, realleges, and incorporates the preceding allegations of its third party complaint as if copied herein *in extenso*.

44. Warrant number 42 for 415,000 shares of FleetCor common stock, as described in the "Common Stock Purchase Warrant," constitutes a security pursuant to Vernon's Texas Civil Statutes Art. 581 §4.

45. FleetCor misrepresented the terms of the Licensee Warrant Program and failed to make certain material disclosures pertaining to the terms of the Licensee Warrant Program in violation of Texas Securities Act, Vernon's Texas Civil Statutes Art. 581 §33.

46. BHOC will suffer damages if, as a result of Clarke's, Berylson's, and FleetCor's misrepresentations and failure to disclose material information to BHOC, FleetCor is permitted to profit from its unilateral attempt to amend the Licensee Warrant Program in 2003, approximately two years after the terms and provisions of the Licensee Warrant Program had been finalized on September 13, 2001.

WHEREFORE, third party plaintiff, Barney Holland Oil Company, prays that judgment be entered in its favor, and against third party defendants, Ronald F. Clarke and John G. Berylson, finding that:

1. Ronald F. Clarke and John G. Berylson are jointly and severally liable for all damages suffered by BHOC as a result of their violation of Federal securities laws, Louisiana securities laws, and Texas securities laws; and,

2. Granting BHOC all other legal and equitable relief, including, but not limited to, attorneys' fees, costs, and interest.

Respectfully submitted,

_____
Kyle Schonekas, 11817
Joelle F. Evans, 23730
SCHONEKAS, WINSBERG, EVANS
 & MCGOEY, L.L.C
Texaco Center
400 Poydras Street, Suite 2040
New Orleans, Louisiana 70130
Telephone: (504) 680-6050
Facsimile: (504) 680-6051

Attorneys for Barney Holland Oil Company

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Third Party Complaint of Barney Holland Oil Company has been served upon all counsel of record by placing same in the United States mail, postage prepaid and properly addressed, this 8th day of June 2005.

_____
JOELLE F. EVANS



September 13, 2001

To: Licensee Owners / GM's
CC: FleetCor Board of Directors
From: Ron Clarke

**RE: FleetCor Licensee Warrant Program***

Dear Licensee:

In our ongoing efforts to build stronger ties with the licensee group and encourage network growth, FleetCor recently announced it would be introducing a licensee warrant program. We are pleased to advise you that we have finalized the program design and would like to share the program details with you at this time. This memo will provide you with a basic overview of the program's major provisions. You should be receiving more detailed program information over the next few weeks. In the interim if you should have any questions about the program, please feel free to call Scott Ruoff at 770-449-1698.

### Eligibility Requirements

All active Fuelman licensees currently in "good standing" will be eligible participants in the program. Good standing mean that participants are in compliance with current contractual fee arrangements. Participants must remain actively processing and in good standing through the 2004 processing year to maintain their eligibility in the program. In the event a participant's territory is sold or transferred during the term of the program, the rights to the warrant grant will be assigned to the buyer of the territory. Other than the assignment of rights to the buyers of these territories, no additional participants will be added to the program.

### Warrant Pool and Pricing

FleetCor will earmark 415,000 warrants for the program (approximately 5% of today's outstanding shares). The warrants will carry a strike price of $5, which approximates FleetCor's fair market value per share today.



Case 3:05-cv-00235-JJB-SCR   Document 13   06/08/05   Page 14 of 15
DEC-22-2004 11:11AM   FROM-FUELMAN OF MICH                231 719 4488           T-179  P 003/004  F-327

2

## Individual Participant Warrant Allocations

The warrant pool will be allocated pro-rata to individual participants based on their total gallons processed between 07/02/01 to 12/26/04. The following example illustrates what the allocation would be today if it were based on the total gallons processed between January and June of this year.

| Program Participant | 2001 YTD Gallons (M)* | % of Total Gallons | # of Warrants |
|---|---:|---:|---:|
| 1. Atlanta | 43.0 | 10.6% | 43,872 |
| 2. Carolinas | 42.7 | 10.5% | 43,533 |
| 3. Oklahoma | 36.9 | 9.1% | 37,642 |
| 4. Mississippi | 29.8 | 7.3% | 30,375 |
| 5. Baton Rouge | 28.9 | 7.1% | 29,491 |
| 6. Houston | 28.2 | 6.9% | 28,793 |
| 7. Arkansas | 25.0 | 6.1% | 25,466 |
| 8. West Texas | 23.2 | 5.7% | 23,656 |
| 9. Lafayette | 15.2 | 3.7% | 15,451 |
| 10. Shreveport | 14.3 | 3.5% | 14,545 |
| 11. Michigan | 12.7 | 3.1% | 12,985 |
| 12. E. Ohio | 12.2 | 3.0% | 12,404 |
| 13. S. California | 11.8 | 2.9% | 12,033 |
| 14. Dallas | 11.3 | 2.8% | 11,470 |
| 15. Radd Energy | 11.2 | 2.7% | 11,402 |
| 16. St. Louis | 10.3 | 2.5% | 10,546 |
| 17. Austin | 9.7 | 2.4% | 9,938 |
| 18. Chicago | 7.8 | 1.9% | 7,963 |
| 19. Empire Fleet | 7.3 | 1.8% | 7,422 |
| 20. Mid-Atlantic | 7.1 | 1.7% | 7,221 |
| 21. N. Ohio | 5.5 | 1.4% | 5,642 |
| 22. S. Penn / S. New Jersey | 3.6 | 0.9% | 3,716 |
| 23. Charleston | 3.2 | 0.8% | 3,269 |
| 24. Oregon | 2.1 | 0.5% | 2,144 |
| 25. N. Colorado | 2.1 | 0.5% | 2,093 |
| 26. New England | 1.8 | 0.4% | 1,796 |
| 27. S. Florida | 0.1 | 0.0% | 119 |
| 28. Minnesota / W. Wisconsin | 0.0 | 0.0% | 12 |
| 29. Indiana | 0.0 | 0.0% | 0 |
| 30. Virginia | 0.0 | 0.0% | 0 |
| Total | 407.1 | 100% | 415,000 |

* Reflects all gallons processed in territory between January and June 2001.

As a reminder, the actual calculations will be based on gallons processed between 07/02/01 and 12/26/04. We will provide all participants with an updated "allocation scorecard" (similar to the one above) at the end of each processing year.

3

### Granting, Vesting, and Forfeiture Provisions

The warrant certificate pool will be issued and held in trust with a mutually agreed-upon escrow agent until they are granted to individual participants on 12/27/04. Warrants will be 100% vested upon the grant date. In the event of a 100% sale of the company or an IPO, the warrants will be granted/vested immediately based upon the gallons processed to the date of the sale or IPO. Participants must be active and in good standing to receive the grant.

In the event a participant terminates their relationship with FleetCor and "takes" their gallon production away from the network, their gallon production will not be included in determining the final warrant allocations. The warrant pool will remain unchanged with 415,000 warrants.

### Exercise Provisions

Upon grant and vesting, licensees may exercise their right to purchase the warrants at any time for a period of three years (12/27/07), after which time the warrants expire.

I hope this letter provides you with a good overview of the warrant program. We believe the program will help to better align our collective interests, and also represents a great opportunity for Licensee participants to share in FleetCor's future growth and success. Thanks again for your continued support.

\* Note (required legalese): This letter does not constitute an offer of any warrants to any person or in any state in which the offer or sale of the rights contemplated hereby would require registration under any applicable federal or state law. Participation will require that licensees be Accredited Investors under Federal Securities laws as evidenced by an investor agreement by each licensee. FleetCor will not issue warrants in states where such issuance has to be registered.